UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**GREGORY NIX**<br><br>    Defendant. | Case No. 21-cr-678 (BAH) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Gregory Nix to 70 months' incarceration, which is at the middle of the 63 to 78 month guideline range calculated by the Probation Office and the United States, three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $100.

I.   INTRODUCTION

The defendant, Gregory Nix, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Before coming to the Capitol, Nix anticipated, and even looked forward to, violence. He was undeterred when his cousin advised that it "may get violent," responding that he had "no problem with tar and feathering," and that he planned to "get my pistol permit." While at the Capitol, Nix was aggressive and violent. He berated U.S. Capitol Police Officers guarding a door to the Capitol building and then assaulted one of them. Nix hit officer B.A. in the head with this flagpole, causing bodily injury, and continued to thrust the flagpole at officer B.A. After Nix and the mob drove the officers away, Nix attempted to breach the unguarded doors to the Capitol, banging a baton against the East House Doors. When the doors were opened, Nix entered the Capitol along with other rioters, spending about ten minutes inside.

The government recommends that the Court sentence Nix to 70 months' incarceration, for his conviction of violating 18 U.S.C. Sections 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Inflicting Bodily Injury), which is at the middle of the advisory Guidelines' range of 63-78 months, which the government submits is the correct Guidelines calculation. A 70-month sentence reflects the gravity of Nix's conduct, as well as the need to deter Nix and others from using violence in pursuit of their political goals.

II.     FACTUAL BACKGROUND

   A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 38, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.      Gregory Nix's Role in the January 6, 2021 Attack on the Capitol

On January 4, 2021, Nix left Alabama with his wife, his minor son, and his cousin, Phillip Bromley[2], to make the 12-hour trip to Washington, D.C. to protest the results of the 2020 election. Nix is circled in the red hat and black jacket in the image below.



*Figure 1 (taken from third-party)*

Nix, Bromley, and Nix's family approached the Capitol's East Front House Doors. They were among the first rioters to approach these doors, around 2:10 p.m. The screenshot below, from U.S. Capitol CCTV footage, shows Nix (circled in red) making an obscene gesture to the camera

---

[2] Phillip Bromley was charged with misdemeanors for his conduct on January 6, 2021, and was sentenced to three months of incarceration, followed by one year of supervised release. *See U.S. v. Phillip Bromley*, Case No. 21-250 (PLF).

3

as he first approached the doors:



*Exhibit A: CCTV footage at 11 seconds (2:21:12 PM))*

As Nix made the obscene gesture, he mouthed the words "fuck you, assholes," directly at the camera. In his hand, Nix held a yellow Gadsden "Don't Treat on Me" flag on a white flagpole. Because the doors were locked, Nix and the other rioters could not get in, and so they gathered outside the doors. Four U.S. Capitol Police officers, including officer B.A., arrived shortly thereafter. Nix took up a position directly in front of the officers, holding the flag in his hand and berating them.

4



*Figure 2 (taken from a third-party)*

During the confrontation, Nix got directly in the faces of the officers, and attempted to intimidate them. Nix was surrounded and supported by a mob of fellow rioters in this moment, who clearly outnumbered a small and overwhelmed contingent of police officers who were trying to keep rioters like Nix out of the Capitol. *Exhibit A (CCTV footage)*, at 2:23:02 p.m. to 2:27:00 p.m. Nix and other rioters tried to get police officers out of their way, and when this failed, Nix, along with other rioters, attacked. *Exhibit A*, at 2:27:18 PM. Using the flagpole as a weapon, Nix struck officer B.A in the head. Officer B.A. was injured, and received a knot on his head from Nix's flagpole attack.

5

Proceeding:



*Screenshot of Exhibit A at 6:29 minutes (2:27:30 p.m.)*

After striking Officer B.A. in the head, Nix continued to attack, thrusting the flagpole at him.



*Screenshot of Exhibit A at 6:59 minutes (2:27:59 p.m.)*

A portion of the encounter with police is also included in a third-party video in

Government's Exhibit B. In Government's Exhibit B, rioters can be heard telling police officers, among other things, "you are not Americans" and Nix's Gadsden flagpole can be seen being used to spar and fence with officers. The overwhelmed officers soon redeployed elsewhere and walked away to a different location, leaving the doors locked. Nix attempted to follow them, now wielding what appears to be an officer's baton and the flagpole. Bromley interceded and redirected his cousin to the doors, as the next three images depict (Nix is circled in red, Bromley is circled in yellow, and the baton is circled in green in the first image):



*Exhibit A at 7:45 minutes (2:28:47 p.m.)*


*Exhibit A at 7:53 minutes (2:28:53 p.m.)*


*Exhibit A at 8:07 minutes (2:29:07 p.m.)*

Nix then attempted to break the doors' glass windows. Nix tried first with the baton:

8



*Exhibit A at 8:08 minutes (2:29:09 p.m.)*

When this failed, Bromley handed Nix a metal object that Bromley had taken out of his pocket:



*Exhibit A at 8:24 minutes (2:29:24 p.m.) (metal object handed over by Bromley circled in yellow)*

Nix took the metal object and attempted once more to breach the doors with it. He failed, but the doors were eventually opened from the inside by other rioters a few minutes later, around 2:40

9

p.m. Nix and Bromley entered the building and remained inside for approximately nine minutes (from 2:42 p.m. to 2:51 p.m.) leaving through the same door just before law enforcement forced all rioters out of that part of the building. Nix and Bromley were in close proximity to the Speaker's lobby, the location where Ashli Babbit was shot by police who were defending the House Chamber from an onslaught of rioters.



*Figure 3 (Screenshot of Nix taken from CCTV footage inside the Capitol at 2:51:47 p.m, just before he exits)*

### III.    THE CHARGES AND PLEA AGREEMENT

On November 17, 2021, a federal grand jury returned an indictment charging Nix with eight counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Inflicting Bodily Injury, in violation of 18 U.S.C. §§ 111(a)(1) and (b); Destruction of Government Property, in violation of 18 U.S.C.

§ 1361; Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5014(e)(2)(F).

On December 16, 2022, Nix pled guilty to a violation of 18 U.S.C. §§ 111(a)(1) and (b) pursuant to a plea agreement.

## IV. STATUTORY PENALTIES

Nix now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Inflicting Bodily Injury, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office ("PSIR"), the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSIR correctly calculated the Guidelines range as follows:

| Base offense level: | 14 | U.S.S.G. §2A2.2(a). |
|---|---|---|
| Special Offense | +4 | U.S.S.G. §2A2.2(b)(2)(B).  A dangerous weapon [to wit: a |

| Characteristic | | flagpole] was used. |
|---|---|---|
| Specific Offense characteristic | +3 | The victim sustained bodily injury. U.S.S.G. §2A2.2(b)(3)(A). |
| Special Offense Characteristic | +2 | The defendant was convicted under 18 U.S.C. §111(b). U.S.S.G. §2A2.2(b)(7). |
| Victim Related Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person). |
| Adjusted Offense Level | 29 | |
| Acceptance of Responsibility | -3 | The defendant has clearly demonstrated acceptance of responsibility for the offense, and the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. U.S.S.G §3E1.1(a) and (b). |
| Total Offense Level | 26 | |

The U.S. Probation Office calculated Nix's criminal history as category I, which is not disputed. PSIR ¶ 47. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, of 26, Nix's Guidelines imprisonment range is 63 to 78 months. PSIR ¶ 88. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Nix's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

12

being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Nix joined a mob that menaced the police who were performing their sworn duty to protect the Capitol. Nix directly engaged in violence, hitting Officer B.A. over the head with a flagpole, causing him bodily injury, and continued to attack the officer, thrusting his flagpole at him. He then attacked the building itself, first with a baton, and then a metal object. Nix's actions were consistent with his pre-January 6, 2021 statements regarding violence and lawlessness at the Capitol. The nature and circumstances of Nix's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 70 months.

### B. The History and Characteristics of the Defendant

Nix is 54 years old and has no criminal history. He has a high school diploma. He did not suffer any abuse or neglect in his upbringing and he has a supportive family. In sum, Nix has had advantages in life that many who appear before this Court do not have, which makes his choice to engage in crime on January 6, 2021—to attack the seat of government and a uniformed police officer—all the more aggravating.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Nix's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

13

domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although the defendant has a criminal history category of I, his statements before January 6, indicating he has no problem with "tarring and feathering" along with his reprehensible conduct on January 6 itself, indicate a willingness and determination to do violence. Second, there is nothing in the record indicating that Nix has expressed any remorse at all for his conduct. This defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

15

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Caldwell*, 21-cr-181 (CKK), Caldwell, a Marine veteran, armed himself with bear spray and protective eye-wear on January 6. After spraying a line of officers protecting the Lower West Terrace, he made his way up to the Capitol building and entered through the Senate Wing door. During the riot, Caldwell taunted police officers. Like Nix, Caldwell pled guilty to violating 18 U.S.C. §§ 111(a)(1) and (b) and caused bodily injury, resulting in the same advisory guidelines imprisonment range of 63-78 months that Nix faces. Judge Kollar-Kotelly imposed a sentence of 68 months.

The Court may also wish to consider *United States v. Ponder*, 21-cr-259 (TSC). Ponder assaulted police officers in the West Plaza. He swung a pole at one police officer that broke on a police shield. When that pole broke, Ponder used another pole to assault another police officer and used that same pole against other officers in the Lower West Terrace. Ponder also traveled to the Lower west Terrace and confronted officers at the entrance of the tunnel in that location. Ponder pled guilty to violating 18 U.S.C. §§ 111(a)(1) and (b). Ponder faced a lower sentencing

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

range than Nix because he did not cause bodily injury. Judge Chutkan sentenced Ponder to 63 months imprisonment.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[6] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer B.A., suffered bodily injury as a result of Nix's assault, but did not incur any medical expenses. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Nix must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Nix played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not

Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021 (and since the plea letter was executed, that estimate has increased to $2,881,360.20 as noted in footnote 1 above). *Id.* Nix's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

### VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 70 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: */s/ Christopher M. Cook*
CHRISTOPHER M. COOK
Assistant United States Attorney
KS Bar No. 23860
601 D. Street N.W.
Washington, D.C. 20530
412-327-3487
christopher.cook5@usdoj.gov

---

qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).